Aymen A. Aboushi, Esq.
The Aboushi Law Firm, PLLC
1441 Broadway, 5th Floor
New York, NY 10018
Tel. 212.391.8500
Fax 212.391.8508
Aymen@Aboushi.com
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| GARDEN STATE ISLAMIC CENTER, a New Jersey Non-Profit Corporation,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF VINELAND, et al.<br><br>Defendants. | Civ. No.: 1:17-cv-01209(JHR)(KMW)<br><br>**Plaintiff's Opposition to Defendants' Motion to Dismiss** |

# Table of Contents

Preliminary Statement ........ 1
Facts ........ 2
Standard ........ 17
Analysis ........ 19
I. This Matter is Ripe for Adjudication in this Court ........ 19
II. Defendants' shotgun approach to their motion to dismiss must be denied. ........ 22
III. The Complaint Sufficiently Pleads Claims under RLUIPA. ........ 24
IV. GSIC states a claim under the Equal Protection Clause and under NJCRA. ........ 34
V. Plaintiff has alleged violation of its First Amendment Free Exercise Clause and under NJCRA. ........ 34
VI. The Mosque has properly alleged a claim for unlawful levy of taxes against it. ........ 35
VII. Defendants violated GSIC's due process rights under the Constitution and under NJCRA. ........ 36
VIII. The Court has jurisdiction over Plaintiff's NJLAD claim. ........ 37
IX. Plaintiff respectfully requests permission to file an amended complaint should the Court deem any deficiency in the pleadings to exist. ........ 37
Conclusion ........ 38

# Table of Authorities

**Cases**

Adhi Parasakthi Charitable, Med., Educ., & Cultural Soc'y of N. Am. v. Twp. of W. Pikeland,721 F.Supp.2d 361 (E.D. Pa. 2010) …………………………………………. 32

Armstrong v. Manzo, 380 U.S. 545 (1965) …………………………………………………. 36

Babbitt v. United Farm Workers National Union, 442 U.S. 289 (1979) ………………………. 22

Bethel World Outreach Ministries v. Montgomery Cty. Council, 706 F.3d 548 (4th Cir. 2013) ……………………………………………….. 26, 29, 30, 31

Church of Hills of Twp. of Bedminster v. Twp. of Bedminster, 2006 WL 462674, (D.N.J. Feb. 24, 2006) ………………………………………………………. 18, 34

Civil Liberties for Urban Believers v. City of Chicago, 342 F.3d 752 (7th Cir. 2003) ……….. 30

Congregation Kol Ami v. Abington Township, 309 F.3d 120 (3d Cir. 2002) …………………. 34

Elsmere Park Club, L.P. v Town of Elsmere, 542 F3d 412 (3d Cir 2008) …………………….. 36

Fortress Bible Church v. Feiner, 694 F.3d 208 (2d Cir. 2012) …………………….. 25, 27, 28, 29

Fowler v. UPMC Shadyside, 578 F.3d 203 (3d Cir. 2009) ……………………………………2

Fraternal Order of Police Newark Lodge No. 12 v. City of Newark, 170 F.3d 359 (3d Cir. 1999) ……………………………………………………………………... 34

Fuentes v. Shevin, 407 U.S. 67 (1972) ……………………………………………………. 36

Guru Nanak Sikh Soc'y of Yuba City v. Cnty. of Sutter, 456 F.3d 978 (9th Cir. 2006) ………. 29

Hedges v. United States, 404 F.3d 744 (3d Cir. 2005) ………………………………………. 17

In re Burlington Coat Factory Sec. Litig., 114 F3d 1410 (3d Cir 1997) ………………………. 23

Islamic Soc'y of Basking Ridge v. Twp. of Bernards, 2016 WL 7496661, (D.N.J. Dec. 31, 2016) …………………………………………………… 18, 19, 25, 32

Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch, 510 F.3d 253 (3d Cir. 2007) …………………………………………………………………….. 18, 33

Lum v. Bank of America, 361 F.3d 217 (3d Cir. 2004) ……………………………………….. 17

Midrash Sephardi, Inc. v. Town of Surfside, 366 F.3d 1214 (11th Cir. 2004) ………………… 31

NE Hub Partners, L.P. v. CNG Transmission Corp., 239 F.3d 333 (3d Cir. 2001) ……………. 21

Petra Presbyterian Church v. Vill. of Northbrook, 489 F.3d 846 (7th Cir. 2007) …………….... 31

Philadelphia Federation of Teachers, American Federation of Teachers, Local 3, AFL-CIO v. Ridge, 150 F.3d 319 (3d Cir. 1998) …………………………………………………….. 21

Phillips v. Cnty. of Allegheny, 515 F.3d 224 (3d Cir.2008) …………………………………… 17

Pinker v. Roche Holdings Ltd., 292 F.3d 361 (3d Cir. 2002) ………………………………….. 17

Prater v. City of Burnside, 289 F.3d 417 (6th Cir. 2002) ………………………………... 19, 25

Presbytery of New Jersey Orthodox Presbyterian Church v. Florio, 40 F.3d 1454 (3d Cir. 1994) ……………………………………………………………………………… 21

Reaching Hearts International, Inc. v. Prince George's County, 368 Fed. Appx. 370 (4th Cir. 2010) ……………………………………………………………………… 26, 31

Saints Constantine & Helen Greek Orthodox Church, Inc. v. City of New Berlin, 396 F.3d 895 (7th Cir. 2005) ……………………………………………………………………….... 29

Second Baptist Church of Leechburg v. Gilpin Twp, Pennsylvania, 118 F. App'x 615 (3d Cir. 2004) ……………………………………………………………………….... 19, 27, 28, 34

United States v. Bensalem Twp., Pennsylvania, 220 F. Supp. 3d 615 (E.D. Pa. 2016) …… 32, 33

U.S. v. Cty. of Culpeper, Virginia, 2017 WL 1169767 (W.D. Va. Mar. 29, 2017) ……………………………………………………………………………..26, 27, 28, 29

Westchester Day Sch. v. Vill. of Mamaroneck, 504 F.3d 338 (2d Cir. 2007) …………….... 28, 29

**Statutes**

New Jersey Statutes Annotated (NJSA)

7:9A-2 ……………………………………………………………………… 14, 20

7:9A-7-4 …………………………………………………………………………24

10-5-3 ……………………………………………………………………….... 37

54:4-63 ………………………………………………………………………….. 35

Religious Land Use and Institutionalized Act Persons Act of 2000 ("RLUIPA") codified as Title 42, United States Code § 2000cc ………………………………………………………… *passim*

Section 2000cc ……………………………………………………………………… 18

Section 2000cc(a)(1)–(2) ……………………………………………………… 18, 28, 31

Section 2000cc(b) …………………………………………………………………… 18

Section 2000cc(b)(1)–(3) .......... 19, 32

Section 2000cc-2(b) .......... 25

Section 2000cc-3(g) .......... 25

Section 2000cc-5 .......... 30

Section 2000cc-5(5) .......... 18

Section 2000cc-5(7)(B) .......... 29

U.S. Const. amend. XIV, § 1 .......... 36

Vineland Code

Section 647-20 .......... 35

Section 647-27 .......... 35

**Additional Sources**

146 Cong. Rec. S7, 774–01, (daily ed. July 27, 2000) .......... 18

Erwin Chemerinsky, Federal Jurisdiction, § 2.3.1 (1989) .......... 21

Preliminary Statement

This is an action that stems from Defendant City of Vineland ("Vineland") and their representatives' willingness to engage in discriminatory and unequal practices which serve as an attempt to trample the Garden State Islamic Center's ("GSIC" or "Mosque") ability to exist. Vineland's unlawful practices toward Plaintiff are well documented. Previously, Vineland denied Plaintiff's right to build its' house of worship. Plaintiff was forced to bring legal action at that time which resulted in a settlement and the issuance of appropriate building permits. Unfortunately, Vineland's predatory actions did not cease. The instant action represents Vineland's new plan to cripple Plaintiff's ability to complete construction and flourish as a cornerstone of the community.

In a transparent, legally baseless effort to shirk any responsibility whatsoever for the stark violations committed, Vineland and the individual defendants file the instant motion to have the matter dismissed under Rule 12(b)(6). To be sure Defendants' motion is grounded in fatally flawed premises as they ignore the relevant standard of law, and ask this Court to accept their factual version of events despite the fact the Rules require this Court to accept all Plaintiff's factual allegations as true. Indeed, in support of their motion, Defendants ask the Court to go beyond the four corners of the Complaint and make findings of fact to convince the Court that the Complaint should be dismissed. Defendants remarkably seek this relief prior to the commencement of discovery.

In addition, Vineland further attempts to absolve themselves of any liability by speciously arguing that Plaintiff should be barred from recovery because Plaintiff's allegations are not ripe for adjudication and do not involve municipal land use regulation and

thus fall outside the purview of a RLUIPA. These arguments are plainly wrong. The matter before the Court is undoubtedly ripe. Furthermore, and contrary to Vineland's assertions to the contrary, RLUIPA not only protects from unequal land use regulations but also mandates that land use laws be applied in an equal manner. Indeed, it is Vineland's imprudent application and use of the law which gives rise to their discriminatory intent.

Finally, and most telling, is the fact that Vineland does not argue the justness of their actions. Rather, Vineland argues – albeit improperly – that various technicalities make their conduct unreviewable. Fortunately, our standing law says otherwise. This Court need look no further that the well plead Complaint to discern the obvious and legally plausible claims that adequately allege viable causes of action.

## Facts

The allegations set forth in the Complaint are incorporated herein, and must be accepted as true and construed in a light most favorable to the plaintiff. Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009). In 2009, GSIC initially applied to the City of Vineland Planning Board (the "Planning Board") for preliminary and final major site plan approval, a conditional use permit, and bulk (or "C") variances for the construction of a house of worship with related religious facilities on the property. ¶ 11. At that time and at all relevant times specified in this Complaint, GSIC's use of the Property as a religious house of worship was permitted as a conditional use in the City of Vineland Zoning Ordinance. ¶ 12.

Prior to submitting its' formal site plan application to the Planning Board, GSIC submitted an advisory application to the Planning Board's professional consultants to ascertain what, if any, specific concerns that the Board may identify with respect to GSIC's

proposed site plan. ¶ 13. In a written response to the advisory application submitted in 2009, the City's professional consultants recommended certain site plan revisions, including the construction of a new access road to the proposed house of worship, all of which GSIC agreed to. ¶ 14.

On August 12, 2009, the Planning Board held a hearing on GSIC's formal site plan application at which members of the public voiced their concerns with the placement of an Islamic house of worship in the community even though GSIC's proposed use indisputably was and is a permitted conditional use of the Property under the City of Vineland Zoning Ordinance. ¶ 15. The Planning Board ultimately denied GSIC's original site plan application following the August 12, 2009 hearing. ¶ 16. Subsequently, GSIC filed a Complaint in lieu of Prerogative Writs in the Law Division of the New Jersey Superior Court (Cumberland County) under Docket No. L-000891-09 against the Planning Board seeking the reversal of the Planning Board's denial of GSIC's site plan application. ¶ 17.

Subsequent to the filing of the September 14, 2009 Complaint in lieu of Prerogative Writs, GSIC and the Planning Board settled that litigation and GSIC submitted a new site plan application to the Planning Board for its proposed house of worship. ¶ 18. As early as 2010, the City of Vineland acknowledged that GSIC was a 501(c)(3) tax exempt, not-for-profit charitable entity and refunded development review fees to GSIC based on its 501(c)(3) status. ¶ 19. On January 12, 2011, GSIC received final major site plan approval from the City of Vineland Planning Board to construct a three-level, 61,540 square foot house of worship consisting of: a) a 9,563.25 square foot basement level containing a bathroom, kitchen, mechanical room and storage space; b) a 30,304.45 square foot first floor level containing a men's prayer hall, women's prayer halls, multi-purpose hall, library, media

rooms and various meeting rooms and offices; and c) a 21,670.45 square foot second floor level containing multiple lecture rooms, offices, a library, meeting room and other miscellaneous space on the Property (the "2011 Site Plan Approval"). ¶ 20.

The 2011 Site Plan Approval evidences a seating capacity of **220** persons onsite for the 61,540 square foot building that was approved for the GSIC. ¶ 21. In 2012, the GSIC decided to substantially **reduce** the size of the building that was approved by the 2011 Site Plan Approval. ¶ 22. On June 26, 2012, the GSIC received an administrative site plan approval from Vineland Senior Planner Stephen Hawk to instead construct a house of worship with no basement level, a 29,745 square foot first floor level and an 18,853 square foot second floor level (the "2012 Amended Site Plan Approval"). ¶ 23.

The building that was **actually** built for the GSIC in 2012, and which exists today, has a building footprint of only 8,393 square feet, which is drastically smaller than the building that was approved by the 2011 Site Plan Approval or the 2012 Amended Site Plan Approval. ¶ 24. On September 15, 2011, GSIC obtained an individual septic permit from the Vineland City Health Department that was designed to accommodate a maximum sanitary sewage flow capacity of 3,000 gallons per day. ¶ 25. The anticipated sewage flow from the GSIC building was estimated to be approximately 1500 gallons per day. ¶ 26.

On November 15, 2012, Defendants sent a letter to GSIC's contractor advising that the septic system servicing the as-constructed GSIC building was "inspected and approved." ¶ 27. A temporary certificate of occupancy was issued shortly thereafter by the City's building department, thus allowing the GSIC to open its one-level, approximately 8,393 square foot facility for religious education and worship. ¶ 28.

In March of 2016, GSIC began applying for permits to construct a second floor level that would have the same 8,393 square feet of area as the existing first floor. ¶ 29. One of the permits that GSIC required for the construction of the second floor was a new septic system permit evidencing that the existing septic system onsite could accommodate the new second-floor area being constructed. ¶ 30. The second floor construction consists of lecture rooms and/or religious education classrooms, offices, a library, mechanical/storage space, and men's and women's restrooms identified as "locker rooms" and "toilet rooms." ¶ 31.

The men's and women's "locker rooms" do not contain showers, and contain 2 toilets and 2 sinks each, similar to what a customary restroom would contain. ¶ 32. All of the uses indicated on the second-floor construction plan were expressly approved by the Vineland City Planning Board as part of the 2011 Site Plan Approval. ¶ 33. On April 4, 2016, Mr. Lugiano wrote a letter to GSIC advising that the second floor construction "fit out" plan containing the rooms "were not included in the original septic system design". ¶ 34. He then stated that the "original septic system was designed for a 500 seat mosque." ¶ 35.

A 500 seat mosque would require a much larger structure than GSIC's existing 8,400 square foot building. ¶ 36. This assertion in Mr. Lugiano's letter led GSIC and its contractors to the belief that Mr. Lugiano did not know the existing size or use of the GSIC's building. In that letter he also incorrectly indicated that showers are included in GSIC's proposed second-floor. No showers are proposed for the "locker rooms" indicated on the second-floor plan. ¶ 37. Mr. Lugiano concludes his letter by stating his offices "belief" that GSIC has exceeded the original septic system design capacity and requiring that GSIC obtain

a "flow determination" from the New Jersey Department of Environmental Protection's Bureau of Non-Point Pollution Control." ¶ 38.

In reality, GSIC's septic system did not exceed 1,500 gallons or exceed the use in the approved septic system for which Vineland issued a permit. ¶ 39. The current and approved occupancy of the GSIC is **220** persons. ¶ 40. Application of simple math releveled that at the standard three gallons per day for a maximum of 220 persons a day, yielded 660 gallons of water per day. ¶ 41. GSIC does not maintain 220 visitors each day. At most, perhaps 80 worshipers attend services for two hours on Fridays. ¶ 42. The City of Vineland's determination that GSIC exceeded 1,500 gallons per day is significant because it used that erroneous fact to deny GSIC a final Certificate of Occupancy and required it to apply to the State of New Jersey for a permit to install a significant and costly septic system and waste management system. ¶43. Any water usage under 2,000 gallons does not require State Approval, permits or a significantly costly upgrade to the septic system. ¶ 44.

On April 13, 2016, the GSIC's project manager Richard Oberman, PE, PP, CME wrote a letter to Mr. Lugiano in response to his April 4, 2016 letter to the GSIC. Mr. Oberman states that the original septic system design was for a "maximum seating capacity of 500 persons" and "a 500 seat church (or prayer room meeting areas) was never proposed or approved by Planning or Zoning." Mr. Oberman goes on to state that the GSIC:

> has operated with associated prayer rooms, offices, classrooms, kitchen area, etc. on the original first floor. Temporary partitions and chairs are set up in the Foyer area to accommodate the classroom areas. The classrooms that occupy the Foyer, will be relocated to the newly constructed second floor. The Foyer can then be used as originally designed as a meet and greet area. Again there is no proposed change in seating, capacity or use. During times of prayer, all persons are in the prayer rooms, and

> when prayer has been dismissed, other rooms are available for use. ¶ 45.

On April 21, 2016 Mr. Lugiano had an e-mail conversation with Mark Miller, Environmental Specialist 3 at the New Jersey Department of Environmental Protection's Bureau of Non-Pollution Control. ¶ 46. No representatives of the GSIC nor any of the GSIC's contractors were included in this e-mail conversation. ¶ 47. In his initial e-mail to Mr. Miller, Mr. Lugiano references the GSIC's requested septic approval for the second floor fit-up of the GSIC building. He then goes on to discuss the 2011 Site Plan Approval and the square footages that were approved by the Planning Board for the basement, first floor and second floor equaling a total of over 61,000 square feet as opposed to the approximately 16,800 square foot building the GSIC actually proposed, including the second-floor construction. ¶ 48. However, it appears that Mr. Lugiano had only recently become aware of the 2011 Planning Board approvals and was under the impression that GSIC was constructing a facility that matched the size of the facility approved by the Planning Board in 2011. ¶ 49.

In his initial e-mail Mr. Lugiano also seems to characterize the existing "warming kitchen" area in the GSIC building as a commercial kitchen that produces waste akin to a kitchen in a commercial facility such as a restaurant. ¶ 50. Mr. Lugiano then asked Mr. Miller for guidance in calculating the daily flow for a facility that was the size of the facility approved by the Planning Board in 2011. ¶ 51. Mr. Miller responded to Mr. Lugiano's April 21, 2016 initial e-mail by stating that "we've [the NJ Department of Environmental Protection] have [sic] dealt with a number of these types of facilities before and this is on the larger side of the proposals we've seen. Typically, with any type of kitchen, you're looking

at less than 16,000 square feet of total area if you want to stay under 2,000 gallons [per day of waste].” ¶ 52.

What Mr. Miller did not know based on the purposefully misleading and incorrect information provided by Mr. Lugiano was that the GSIC building, including the second-floor construction, would contain only 16,800 square feet of total floor area and an 8,393 square foot building footprint, which is the same building footprint that existed prior to the construction of the second floor. ¶ 53. Mr. Miller was also unaware that the existing first-floor “warming kitchen” referred to by Mr. Lugiano only contains a microwave, a small stove, a dishwasher and refrigerator and does not contain **any** commercial cooking facilities akin to a restaurant kitchen. ¶ 54.

On April 22, 2016 Mr. Lugiano wrote a second letter to the GSIC asserting that the existing septic system “is no longer in compliance with the original approval issued by this department” based on the “current unpermitted uses of the facility (kitchen, offices, classrooms, etc.)”. ¶ 55. This was because Mr. Lugiano was purposefully applying arbitrary and erroneous water flow calculations in an effort to unlawfully deny GSIC their final certificate of occupancy. ¶ 56. Mr. Lugiano concludes his letter by again stating that his office “will have no further involvement until a [flow] determination is made” by the NJDEP-BNPC. Although aware by this point of the 2011 Site Plan Approval, Mr. Lugiano incorrectly states in his letter that the uses within the GSIC building, including classrooms, offices and the like were “unpermitted”. ¶ 57.

Also, based on his April 21, 2016 e-mail conversation with Mr. Miller of the NJDEP-BNPC, it appears Mr. Lugiano is referring to an approximately 60,000 square foot building in his letter, and not a building approximately **25%** of that size which is **actually proposed**

by the GSIC. ¶ 58. On May 3, 2016, the GSIC's project architect David Manders wrote to Vineland City Health Department Director Dale Jones in response to Mr. Lugiano's April 22, 2016 letter. In that e-mail, Mr. Sanders states:

> There is a misconception in these documents that needs to be remedied, and it is as follows: what exists at the site is a two-story building with a footprint of 8,393.12 square feet. There is no basement. The first floor is finished and the applicant is seeking to finish the second floor. The numbers outlined in Gary Lugiano's email of April 21, 2016 do not reflect at all what is built or what the applicant has sought building department approval for. The applicant is seeking approval to finish the second floor of this building only. If (and when) the applicant seeks to do additional construction, permits and approvals will need to be obtained. Our position is simple…to determine if the septic system that was installed previously is sufficient to allow for the finishing of the second floor in conformance with the documents prepared by our office. It is not the applicant's desire to construct the 61,538.15 sf building noted in Gary's email. While the approved site plan indicates a building of this magnitude, the applicant has not sought approval for permits to construct this building (which was projected to be accomplished in multiple phases and may or may not ever be built). The applicant fully realizes that any future applications for building additions will most likely require an upgrading of the current septic system. I would hope that this clarification finds its way to the NJ Department of Environmental Protection so that a determination can be made based on the actual conditions that exist and are proposed. As always, please do not hesitate to contact me with any questions. ¶ 59.

Following this correspondence, and in an attempt to resolve this issue, GSIC agreed to close out any and all open construction permits that would allow for the future growth of the GSIC building. ¶ 60. GSIC also agreed to provide Mr. Lugiano and the Vineland City Health Department was an "as built" plan of the GSIC building and the flow calculations associated with the existing and proposed rooms on both floors. ¶ 61. GSIC was also assured at a May 25, 2016 meeting with City officials, including Dale Jones and Patrick

Finley, that if it closed out its existing permits for future construction and complied with the Health Department's requests regarding flow calculations, the septic permit would be issued by the Health Department. ¶ 62.

On June 8, 2016, Mr. Oberman sent a revised flow calculation spreadsheet to Mr. Lugiano for his review and approval, which included all of the existing and proposed rooms as well as the square footages associated with each, for the GSIC building. ¶ 63. The total estimated gallons per day of sewage flow based on Mr. Oberman's calculations was 1,486, well below the 2,000 gallons per day threshold for local approval of the GSIC's septic system. ¶ 64. In compliance with Mr. Lugiano's previous request, Dr. Hassan Salah of GSIC sent a letter to the City's Construction Official, which was received by the City's Health Department on May 25, 2016, that stated the following, in relevant part:

> It is our [the GSIC] intention to close our outstanding permit 13-119. The work on the first floor of our existing building is complete. It at some future time, we choose to proceed with additional work on the first floor or for any other phase of our facility, we recognize that we will need to apply for and obtain separate permits. With this letter, we are submitting an application for a Certificate of Occupancy for the first floor of our building.
>
> We have made a separate application for permits to fit out the second floor of our existing building. We understand that permit will be issued upon the closing of the permit for the first floor and payment for permits for the second floor. ¶ 65.

On June 9, 2016, Mr. Lugiano sent another e-mail to Mr. Miller at the NJDEP emphasizing the existing "kitchen" within the GSIC building. Once again, Mr. Lugiano did not attach or reference plans indicating the **correct** size of the GSIC building and it does not appear Mr. Lugiano **ever** communicated the correct size of the GSIC's building, and the true nature of the rooms within the building, to Mr. Miller. ¶ 68.

Notwithstanding the plans and facts establishing otherwise, Vineland continued to misrepresent the structure, use, and occupancy of GSIC to the State, withholding the septic permit, and induce the State to impose requirements for a bigger capacity than the ones used by GSIC. ¶ 69. Indeed, the water flow calculations for the use of the facility used calculations for a commercial kitchen, despite the presence of a small warming kitchen at the facility. ¶ 70. GSIC was being held to higher standards for the septic system than was in the plans, previously approved by Vineland, simply to discriminate against them and prohibit their lawful expansion. ¶ 71. What is more, the square footage does not matter for septic planning purposes. ¶ 72. Rather, the operative statistic is the maximum amount of people permitted at the facility multiplied by three gallons per person. This simple equation, previously used by Vineland in approving the original septic system, yields a simple water flow per day well below the 2,000 gallon limit that would then require State action and approval. ¶ 73.

As long as Vineland continues to incorrectly and discriminatorily insist to the State that the gallons per day was over 2,000, the State would impose burdensome requirements that were both cost-prohibitive and unnecessary. ¶ 74. This caused the GSIC to not be able to grow its facility as it should be permitted to and the Defendants to unlawfully deny it a certificate of occupancy. ¶ 75. In response to Mr. Miller's previous e-mail, Mr. Lugiano fails to correct Mr. Miller's assumption that the GSIC's numbers were based on the approximately 61,000 square foot building approved via the 2011 Site Plan Approval. ¶ 76. Instead, Mr. Lugiano claims that Mr. Oberman was "working backwards" (i.e. reverse engineering) his calculations to say under 1,500 gallons per day of waste flow. ¶ 77. He then goes on to state that the "kitchen waste" from the GSIC building will amount to an

**additional** 1,480 gallons per day along with an **additional** 120 gallons per day resulting from a "mop sink", bringing the total gallons per day of flow to 3,086 in Mr. Lugiano's estimation. ¶ 78.

Again, despite knowing that GSIC had nothing more than a small warming kitchen that was not in use for the vast majority of the time, he imposed the outflow projections for a commercial kitchen to discriminatorily raise the water outflow so that the State requirements for a commercial facility would be imposed, including obtaining new permits from the State and installing a significantly larger (and prohibitively expensive) septic system and waste management system for the land use. ¶ 79. Moreover, under the false and discriminatory flow calculations perpetuated by Vineland, GSIC would have to propose, install, and maintain a waste water treatment facility that is not only prohibitively expensive, but also not needed in light of the stated and approved use. ¶ 80.

No other secular or religious group has had these requirements imposed upon them by Vineland. ¶ 81. No other secular or religious group has had these water flow calculations imposed upon them as Vineland has imposed on GSIC. ¶ 82. No other secular or religious group has had their pre-approved septic permit unilaterally rescinded after it was issued and after construction was complete without any due process. ¶ 83. No other secular or religious group has had their certificate of occupancy withheld in this fashion. ¶ 84. The water flow calculation requirements imposed by the Defendants is a novel way to use a land use regulation to unlawfully deny GSIC its lawful existence. ¶ 85. In essence, Vineland was using false information and discriminatory conduct targeting GSIC in an effort to limit their growth. ¶ 86.

Having an 8,000 square foot house of worship was only permitted after GSIC brought legal action. ¶ 87. Defendants have now changed tactics and used the septic system and associated permit process in the land use of GCIC's property in a discriminatory and burdensome fashion process to deny GSIC the permits to grow their facility. ¶ 88. Mr. Lugiano sent a letter to the GSIC on June 15, 2016 advising that:

> It is our final determination that, **although Mr. Oberman's figure of 1,486 gpd appears accurate**, he did not account for kitchen waste (5 gpd/person) and the mop sink (120 gpd) located on the second floor. Adding kitchen waste for 296 individuals adds an additional 1,480 gpd. Including the mop sink, the total daily volume of sewage has been determined to be 3,086 gpd. Since these activities were not included in the original system design, they are subject to regulation under the current version of NJAC 7:9a. The accuracy of these figures have been confirmed by Mr. [Mark] Miller". (Emphasis added). ¶ 89.

Mr. Lugiano also indicates in that letter that he has unilaterally rescinded all approvals that had previously been issued for the GSIC's septic system. ¶ 90. This revocation was unlawful, discriminatory, not based on any lawful principles, and without any due process. ¶ 91. He also directs GSIC, a simple religious facility, to apply to the NJDEP-BNPC for a Pollutant Discharge Elimination System permit within thirty (30) days. ¶ 92. In one last attempt to clarify to Mr. Lugiano and the City's Health Department the correct size of the GSIC's building with the second-floor construction, as well as to further detail that the projected sewage flow from the building would be under 2,000 gallons per day, the GSIC employed the services of Stephen Nardelli, PE, PP, CME of Fralinger Engineering to provide a "second opinion" and independently analyze the projected sewage flows from the GSIC's building. ¶ 93.

On July 25, 2016, Mr. Nardelli sent a letter to Mr. Lugiano indicating that he reviewed the correct architectural floor plans for the existing first floor and proposed second-floor "fit out" (Mr. Nardelli also attached said plans to his July 25, 2016 letter) and arrived at a total projected sewage flow of 1,442 gallons per day. ¶ 94. Nardelli's letter also cites to the exemption for eating areas and cafeterias inside religious centers contained within the NJDEP's definition of a "commercial food service activity" at NJSA. 7:9A-2.1, which is applicable to septic systems. ¶ 95. Mr. Nardelli also enclosed pictures of the GSIC's existing first-floor "warming kitchen" with his letter which shows that this room only contains typical residential kitchen appliances including a microwave, a small oven (with no stove), a dishwasher and a refrigerator. ¶ 96. Mr. Nardelli concludes his letter by stating that no approvals from the NJDEP would be required in his professional opinion. Mr. Nardelli even offers to install a flow meter on the building's water supply well to verify that the flows from the GSIC's building will not exceed 1500 gallons per day. ¶ 97.

Without any basis, Defendants nonetheless continue to assert that GSIC will produce over 2,000 gallons of waste per day and using that erroneous proposition to deny GSIC a certificate of occupancy. ¶ 98. In order to justify their erroneous water flow calculations, ostensibly used to hide their true intention of discriminating against GSIC and denying its religious practices, the Defendants used water flow calculations that are simply not applicable to GSIC and have never been imposed upon other religious and secular institution. ¶ 99. This included imposing an allotment of water for a small mop sink akin to a hair salon. ¶ 100. It also includes allocating 10 gallons per day, per person for students, for 224 students, even though there is no school at GSIC other than a Sunday school, which is not occupied by more than a teacher and a few students once a week for a few hours. ¶ 101.

Another example of the erroneous math and discriminatory application of laws by the Defendants is allotting a commercial kitchen allotment for the small warming kitchen located at the GSIC. ¶ 102. This conduct is discriminatory and unequal application of the land use regulations for the property. ¶ 103. Indeed, a similarly situated A Christian Church was not subject to the same requirements, and in fact, received more favorable treatment. ¶ 104. Upon information and belief, the Cumberland County Department of Health has within the last 18 months approved a septic system for the "All The Nations Assembly Church of God", located at 659 Landis Avenue in Deerfield Township, Cumberland County, which is a substantially **larger** facility than GSIC's house of worship/religious education building that can seat 470 people, also contains classrooms, a nursery, offices and has an area identified as a "future kitchen" as indicated on the approved building plans for that church. ¶ 105. This Church based its septic flows on a calculation of 3 gallons per day, which calculation was accepted by the Cumberland County Department of Health and this Church was thus not required to obtain a NJPDES Permit and a septic permit was issued locally by the County. ¶ 106.

This Church also has a full time nursery and daycare, Sunday school, kitchen, and 500 members, but was still adjudicated to have less than 2,000 gallons per day waste and permitted to use a septic system without State involvement or waste management systems. ¶ 107. GSIC, on the other hand, with less than half as many occupants, no daily school or nursery, and a Sunday school attended by a handful of children, a simple warming kitchen, was determined by the Defendants have a water usage of over 3,000 gallons per day, requiring State involvement, a waste management plan and treatment facility. ¶ 108.

Defendants are purposefully applying arbitrary, erroneous, and biased calculations and rules upon GSIC simply because it intends to hold religious instruction, despite the fact that the religious instruction is part time, and does not exceed the capacity of the persons permitted under the pre-approved filings. ¶ 122. The purpose, intent, and effect of Defendants' actions is to inhibit and prohibit the exercise of religion. ¶ 123. Defendants continue to threaten to close down GSIC due Defendants' refusal to issue them a certificate of occupancy. ¶ 124. Defendants have used the land use regulation to prohibit GSIC to occupy the masque lawfully. ¶ 125.

Furthermore, Defendants issued a tax bill of nearly $50,000 to GSIC despite knowing that it was a tax exempt institution. ¶ 126. Defendants refuse to rescind the tax bill and are engaging in collection action. ¶ 127. This is yet another way the Defendants continue to harass and threaten GSIC in order to discourage it from practicing its faith freely as required by our laws. ¶ 128. Defendants claim that GSIC did not submit documentation for 2015 that it was tax exempt. ¶ 129. In fact, the Defendants had at all times GSIC's tax exemption documents for all relevant years. ¶ 130.

When GSIC re-submitted the documentation that the Defendants already had regarding its tax exempt status, the Defendants claimed that the submission was untimely. ¶ 131. No other religious institution is required to submit documentation on a yearly basis as the Defendants have required by the Defendants. ¶ 132. Indeed, Defendants know that GSIC is tax exempt, as they did not charge GSIC tax in the years prior to or after 2015. ¶ 133. Nonetheless, Defendants have imposed and are seeking to collect nearly $50,000 in taxes that they knew should not be due. ¶ 134. The Defendants actions violate GSIC's rights to freedom of religion and to practice their faith and imposed an unreasonable burden on the

practice of their faith. ¶ 135. The tax imposed by the Defendants is unlawful and must be declared a nullity and voided. ¶ 136. Defendants' denial of Plaintiff's septic system permit application, and the rescinding of Plaintiff's previously approved septic system permit, was arbitrary, capricious, unreasonable, unlawful, irrational, shocking to the conscience and done without a valid legal basis. ¶ 137

## Standard

In deciding a motion to dismiss the Court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief. Phillips v. Cnty. of Allegheny, 515 F.3d 224, 234 (3d Cir.2008) (quoting Pinker v. Roche Holdings Ltd., 292 F.3d 361 (3d Cir. 2002)). A "defendant bears the burden of showing that no claim has been presented." Hedges v. United States, 404 F.3d 744, 750 (3d Cir. 2005). A complaint should only be dismissed if, after accepting as true all the facts alleged in the complaint, a plaintiff has not pleaded enough facts to state a claim to relief that is plausible on its face, meaning enough factual allegations to raise a reasonable expectation that discovery will reveal evidence of each necessary element. Phillips, 515 F.3d at 234 (citations and quotations omitted). "In deciding motions to dismiss… courts generally consider only the allegations in the complaint, exhibits attached to the complaint, matters of public record and documents that form the basis of a claim." Lum v. Bank of America, 361 F.3d 217, 222 (3d Cir. 2004).

The Religious Land Use and Institutionalized Act Persons Act of 2000 ("RLUIPA"), protects individuals, houses of worship and other religious institutions from discrimination in

zoning and landmarking laws. 42 U.S.C. §§2000cc, et. seq. Where applicable, the statute imposes three requirements for local land use regulations to prevent discrimination against or exclusion of religious uses:

> (1) Equal terms-No government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution.
> (2) Nondiscrimination-No government shall impose or implement a land use regulation that discriminates against any assembly or institution on the basis of religion or religious denomination.
> (3) Exclusions and limits-No government shall impose or implement a land use regulation that unreasonably limits religious assemblies, institutions, or structures within a jurisdiction.

42 U.S.C. § 2000cc(b); Church of Hills of Twp. of Bedminster v. Twp. of Bedminster, No. Civ No. 05-3332, 2006 WL 462674, at *3–4 (D.N.J. Feb. 24, 2006). RLUIPA defines "[l]and use regulation" as "a zoning or landmarking law, or the application of such a law, that limits or restricts a claimant's use or development of land." 42 U.S.C. § 2000cc–5(5) (emphasis added). Islamic Soc'y of Basking Ridge v. Twp. of Bernards, Civ. No.16-1369 (MAS)(LHG) 2016 WL 7496661, at *16 (D.N.J. Dec. 31, 2016) (emphasis added). Congress passed RLUIPA upon finding that local zoning boards would use "vague and universally applicable reasons," such as traffic or aesthetics, to contrive widespread discrimination on the basis of religion. See 146 Cong. Rec. S7, 774–01, (daily ed. July 27, 2000) (joint statement of Sens. Hatch & Kennedy), 2000 WL 1079346, at *S7774. RLUIPA's first section ("Substantial Burdens Provision") prohibits land use regulations that substantially burden the exercise of religion unless the government action can survive a strict scrutiny analysis. 42 U.S.C. § 2000cc(a)(1)–(2); see also Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch, 510 F.3d 253, 269 (3d Cir. 2007)

The second section of RLUIPA, in relevant part, prohibits discrimination and impermissible exclusion on the basis of religion by prohibiting three distinct types of regulations: (1) land use regulations that treat a "religious assembly or institution on less than equal terms with a nonreligious assembly or institution" ("Equal Terms Provision"); (2) land use regulations that "discriminate against any assembly or institution on the basis of religion or religious denomination" ("Nondiscrimination Provision"). 42 U.S.C. § 2000cc(b)(1)–(3). Islamic Soc'y of Basking Ridge v. Twp. of Bernards, Civ No. 16-1369, 2016 WL 7496661, at *16 (D.N.J. Dec. 31, 2016).

"A government agency implements a 'land use regulation' only when it acts pursuant to a 'zoning or landmarking law' that limits the manner in which a claimant may develop or use property in which the claimant has an interest." Prater v. City of Burnside, 289 F.3d 417, 434 (6th Cir. 2002)(citations and quotations omitted); Second Baptist Church of Leechburg v. Gilpin Twp, Pennsylvania, 118 F. App'x 615, 617 (3d Cir. 2004).

## Analysis

### I. This Matter is Ripe for Adjudication in this Court

Vineland argues that the instant matter is not ripe for review before this Court because a final regulatory decision has not been rendered in this matter. More specifically, Vineland argues that Plaintiff has failed to exhaust administrative options which are available through the NJDEP. Vineland's argument is wholly misguided and fails as a matter of law.

This matter has nothing do with the NJDEP. Rather, this matter rises and falls on Vineland's discriminatory conduct. As laid out in the well pled Complaint, the NJDEP's involvement only comes in to play when there is more than 2000 gallons of flow. Plaintiff

vehemently opposes Vineland's assertion that the GSIC's flow is well over 2000 gallons. Indeed, this is an issue of fact that must be resolved by a trier of fact. Vineland desperately wants this Court to look past both the well pled Complaint and the actions which Plaintiff accuses them of, and instead look to some decoy third party for answers when it is Vineland – and only Vineland – that can speak to their capricious conduct. Moreover, the Mosque has had to previously sue the Defendant for discrimination when the Defendant unlawfully deprived the Mosque of approvals to build the Mosque. That matter was resolved with the Defendant agreeing to cease and desist its discriminatory conduct. Vineland has now found a new way to unlawfully inhibit the opening and operation of the Mosque. It is against this backdrop that Defendant now seeks to deny the Mosque a certificate of occupancy based upon unlawful waste flow calculations.

In support of their specious ripeness argument, Vineland argues that this matter is not ripe because they have no discretion in calculating flow determinations and that the NJDEP should take over the process. See Deft. Br. at 17. This argument is belied by the procedural and factual posture of this matter. This matter is in controversy, in part, because Vineland is discriminatorily applying its discretion to limit the scope and use of the Mosque to place it within NJDEP purview so that it must wither engage in a prohibitively expensive (and unnecessary) commercial waste removal system, or significantly downgrade its lawful operations.

As per the New Jersey State Code, a warming kitchen for a religious institution shall not be considered a kitchen for waste flow calculations and no additional waste is to be attributed to the kitchen for a religious institution. NJSA. 7:9A-2. Defendant, however, allots nearly one thousand-five hundred gallons of waste for the small warming kitchen in violation

of the guidelines in the New Jersey guidelines. Moreover, the Mosque is being treated differently than other non-Islamic institutions. A Christian church in the same County, for example, also had a kitchen but did not have any additional waste flow attributed to the Kitchen. This one instance of purposefully misapplying the New Jersey guidelines in Vineland's permitting process is dispositive as, if Vineland aptly employs the New Jersey guidelines in a non-discriminatory fashion, their erroneous waste flow calculation is cut in have.

"The existence of a case and controversy is prerequisite to all federal actions, including those for declaratory or injunctive relief." Presbytery of New Jersey Orthodox Presbyterian Church v. Florio, 40 F.3d 1454, 1462 (3d Cir. 1994). "In some circumstances the ripeness requirement is drawn from Article III limitations on judicial power and in others from prudential limitations." NE Hub Partners, L.P. v. CNG Transmission Corp., 239 F.3d 333, 341 (3d Cir. 2001). The function of the ripeness doctrine is to determine whether a party has brought an action prematurely. Philadelphia Federation of Teachers, American Federation of Teachers, Local 3, AFL-CIO v. Ridge, 150 F.3d 319, 323 (3d Cir. 1998).

The following considerations underpin the ripeness doctrine: are the parties in a sufficiently adversarial posture to be able to present their positions vigorously; are the facts of the case sufficiently developed to provide the court with enough information on which to decide the matter conclusively; and is a party genuinely aggrieved so as to avoid expenditure of judicial resources on matters which have caused harm to no one. See, Erwin Chemerinsky, Federal Jurisdiction, § 2.3.1 (1989). Accordingly, the ripeness doctrine requires that the challenge grow out of a "real, substantial controversy between parties"

involving a "dispute definite and concrete." Babbitt v. United Farm Workers National Union, 442 U.S. 289, 298 (1979).

Vineland argues that the instant matter is not ripe because the NJDEP has not ruled on the questions of fact at issue in this matter. Vineland's legal argument, however, cannot be squared with the facts alleged. For one, Vineland ignores the fact that Vineland comes into this matter with unclean hands. Plaintiff's initial plans to build the Mosque were categorically denied by Vineland. It was only after Plaintiff brought legal action that Vineland relented and provided approvals. Vineland wants this Court to believe that Plaintiff's present issue is somehow in its' infancy. These issues are however mature and ready for a fact finder. In fact, one does not have to look very far to appreciate that Vineland has continuously done everything in its' power to prevent and now cripple Plaintiff's existence. Indeed, how Vineland assigns gallons of waste per use is a factual issue that has come to a point of deep contention. Simply stated, Vineland has applied unfair and unpermitted values for waste in an effort to reach the two thousand gallon threshold that required NJDEP intervention. If Vineland accurately applies the waste allotment and does so in a non-discriminatory fashion, this matter is not within the purview of NJDEP. As such, the exhaustion requirement is inapplicable as the disputed facts, of which the Court is required to credit Plaintiff's version, establish that this matter is not within the purview of NJDEP.

II. Defendants' shotgun approach to their motion to dismiss must be denied.

Defendants ask the Court to dismiss the Complaint. In doing so, Defendants do not present any salient argument for dismissal. In fact, Defendants present no argument whatsoever. Defendants rely on the factually baseless conclusory argument that "[t]he facts

do not support a RLUIPA claim, or any of the Section 1983, New Jersey statutory or constitutional claims asserted." See Deft Br. at 23. Defendants fail to proffer or explain how they reached this conclusion. Rather, they appear to want to Plaintiff or the Court to figure out the heart of their instant motion for them.

Strangely, Defendants do not attack or undermine any of the allegations contained in the Complaint. Rather, Vineland spent significant time and energy attaching a plethora of pre-discovery documents. Although it is unclear what the exact purpose of attaching contested documents to their motion to dismiss, it can only be viewed as a rouse attempting to divert the Court away from the well-plead Complaint and toward Defendants' self-serving marshalling of their facts and evidence. Not only is this highly improper, but it starkly disregards the standard of review in this circuit on Rule 12(b)(6) motions that are well known, well established and well recited by a myriad of district courts daily.

As a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings. However, an exception to the general rule is that a document integral to or explicitly relied upon in the complaint may be considered without converting the motion [to dismiss] into one for summary judgment. In re Burlington Coat Factory Sec. Litig., 114 F3d 1410, 1426 (3d Cir 1997).

Here, none of the documents attached to the motion to dismiss were relied upon in the Complaint. To the extent that they were mentioned in the Complaint, it was for context for the Court, and not explicitly relied upon. Indeed, they were used as examples of the discriminatory conduct of the Defendants—not to be accepted as fact as the Defendants urge.

Moreover, none of the attached documents form the basis of the Plaintiff's claims. In fact, the Plaintiff disputes the accuracy and veracity of the information in these documents.

What Defendants have done is essentially attach their own correspondence, with their contested contentions, and ask the Court to accept these contested documents as a basis for dismissal. For example, and germane to the specific issue in this case, Defendants' Documents contain an analysis of a warming kitchen for employees. Defendants claim that this warming kitchen counts as nearly one thousand four hundred and eight (1,480) gallons of waste. See Bergen Cert. at Ex. I.

Plaintiff, however, vehemently disputes this exact conclusion as the kitchen does not count as waste under the regulations, let alone double the septic system waste, and is but one example of Defendants creative discrimination. A warming kitchen such as the one at the Mosque does not qualify as a kitchen for the purposes of adding waste as a matter of law. See NJSA 7:9A-7-4. The resolution of this case cannot rest on self-serving and Defendant-created documents and interpretation, but rather the factual determinations of the Mosque, its uses, and the regulations that aptly apply to them.

What is more, the documents upon which the Defendants rely contain inaccuracies and hotly contested issues of fact that preclude the Court from relying on them. The documents are not (1) authenticated; (2) complete; (3) part of the pleadings; and (4) certified by anyone with personal knowledge. Simply put - they must be disregarded at this stage of the proceedings. To the extent that the Court intends to rely on these extraneous documents, Plaintiff respectfully request an opportunity to submit their own documents in opposition.

III. The Complaint Sufficiently Pleads Claims under RLUIPA.

A. RLUIPA requires broad construction of the Mosque's claims.

When applying RLUIPA, courts "shall ... construe[ ] [the statute] in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of [the

statute] and the Constitution." 42 U.S.C. § 2000cc–3(g). Additionally, "[i]f a plaintiff produces prima facie evidence to support a claim alleging a violation of ... [RLUIPA], the government shall bear the burden of persuasion on any element of the claim." 42 U.S.C. § 2000cc–2(b); Islamic Soc'y of Basking Ridge v. Twp. of Bernards, Civ. No. 16-1369 WL 7496661, at *17 (D.N.J. Dec. 31, 2016).

Here, the broad construction mandate of RLUIPA requires that the Court construe any ambiguity in favor of the religious protections afforded by RLUIPA. A government agency implements a 'land use regulation' only when it acts pursuant to a 'zoning or landmarking law that limits the manner in which a claimant may develop or use property in which the claimant has an interest." Prater v. City of Burnside, 289 F.3d 417, 434 (6th Cir 2002). A sewage permit is a land use regulation under RULPIA because you cannot get permits to build or a certificate of occupancy without a sewage permit. The implementation of the regulation limits the way the property may be developed and used. As Defendants concede, Plaintiff may not properly occupy its property and use it for religious purposes due to their discriminatory implementation of the land use regulation.

B. The Mosque is challenging a land use regulation.

Circuit Courts have held that sewage permits qualify as land use regulations for RULPIA. Fortress Bible Church v. Feiner, 694 F.3d 208, 216 (2d Cir. 2012) (holding that, even where a law is normally concerned with environmental or health issues, it falls "within the purview of RLUIPA" when used "as the primary vehicle for making zoning decisions"); id. at 218 ("when a statutorily mandated environmental quality review process serves as a vehicle to resolve zoning and land use issues, the decision issued constitutes the imposition of a land use regulation as that term is defined in RLUIPA"). Holding otherwise would

permit localities to make an end-run around RLUIPA's expansive protections under the guise of environmental, safety, or building code regulations. See id. at 218 ("We decline to endorse a process that would allow a town to evade RLUIPA by what essentially amounts to a re-characterization of its zoning decisions."). What is more, other Circuits have indicated that water and sewer regulations are "zoning laws" under RLUIPA. Bethel World Outreach Ministries v. Montgomery Cty. Council, 706 F.3d 548 (4th Cir. 2013); Reaching Hearts International, Inc. v. Prince George's County, 368 Fed. Appx. 370 (4th Cir. 2010) (There, like here, the zoning on a congregation's property permitted churches as of right. But the congregation could not obtain "a change in the sewer and water classification for portions of the property," which "effectively prohibited the church's planned development of a worship center.")

There is ample support for the Court to construe that the zoning law applied by the Defendants here is a land use regulation. In U.S. v. Cty. of Culpeper, Virginia, Civ. No. 16-00083, 2017 WL 1169767, at *6 (W.D. Va. Mar. 29, 2017), a case directly on point with the instant matter, the Court squarely rejected the very arguments that the Defendants assert here. In U.S. v. Culpepper, the Defendant municipality argued that a pump-and-haul permit that it denied to an Islamic Center was not as a zoning law, but a public health law. It further argued that the pump-and-haul permit process is not part of the County's formal zoning scheme, and that the pump-and-haul permit process is a state health law. In rejecting the very arguments that the Defendants assert herein, the Culpepper Court reasoned that sewage permit approval process as a "zoning law" for RLUIPA purposes because: 1. The broad construction requirement of RUIPLA required it to construe a challenged provision in favor the religious claimant to the greatest extent possible; 2. There is ample support in the

Circuits interpreting that sewage regulations are zoning and land use regulations; and 3. Because the zoning laws are intertwined with the sewage permits, the sewage permits are considered zoning laws under RLUPIA. Cty. of Culpeper, Va., 2017 WL 1169767, at *6.

Finally, the septic permit is issued by the Vineland health Department, which is required under the zoning and building ordinance. According to Vineland, a septic permit from the Department of Health must be obtained for a building such as the Mosque, in tandem with zoning and building permits. The septic permit is intertwined with building permits. See www.vinelandcity.org/Documents/Checklist.pdf. Vineland's laws require a certificate of occupancy, building permit and a septic permit. The certificate of occupancy is preconditioned upon obtaining zoning approval, a building permit and a septic permit. Indeed, as alleged, and the Defendants concede, the Mosque cannot obtain a Certificate of Occupancy because of the septic permit. In this circumstance, the septic permit is considered a zoning requirement under RLUPIA. See Fortress Bible Church v. Feiner, 694 F.3d 208, 217 (2d Cir. 2012) (finding RLUIPA applied to environmental law in part because it was "intertwined" with locality's zoning regulation); U.S. v. Cty. of Culpeper, Va., 2017 WL 1169767 at *7.

The only case cited by the Defendants is easily distinguishable from the case at hand. In Second Baptist Church of Leechburg v. Gilpin Twp, Penn., the Court determined that an Ordinance commonly referred to as a "mandatory tap-in ordinance" that requires that any principal building that is located within one hundred fifty feet of any sewer of the sewage system shall connect to it if so directed is not a land use regulation. 118 F. App'x 615, 616 (3d Cir. 2004). That interpretation makes sense because in that situation, as opposed to the one at hand, a regulation was neutrally applied, the church was permitted to open, obtain a

certificate of occupancy, and use its and as it saw fit. In this situation, GSIC cannot lawfully occupy its land, engage in religious exercises, or use its property or develop it. In fact, the Defendants here revoked the permit they issued to GSIC rendering the building not fit or properly permitted for use and occupancy. As such, the Court's opinion in Second Baptist Church actually buttresses the Plaintiff's claim here that what the Defendants' are implementing, construing, and using as a tactic to prevent the use and development of GSIC's land, is in fact a land use regulation.

In sum, where the record supports the inference - as the allegations do here - that a locality "disingenuously used" its procedures "to obstruct and ultimately deny" a congregation's building, courts "decline to insulate" it from "liability with regard to its decisions on zoning issues simply because it decided them under the rubric of an" ostensibly non-zoning process. Fortress Bible, 694 F.3d at 218; U.S. v. Cty. of Culpeper, Va., 2017 WL 1169767 at *8.

C. Defendants are imposing a substantial burden upon the Mosque.

RLUIPA prohibits a government from imposing a land use regulation in a way that creates a substantial burden on the religious exercise of an institution. 42 U.S.C. § 2000cc(a)(1). A substantial burden is one that "directly coerces the religious institution to change its behavior." Westchester Day Sch. v. Vill. of Mamaroneck, 504 F.3d 338, 349 (2d Cir. 2007) (emphasis omitted). A denial of a religious institution's building related permit likely imposes a substantial burden where, as here, there is no possibility of modification and resubmission. See id. Moreover, when the town's actions are arbitrary, capricious, unlawful, or taken in bad faith, a substantial burden may be imposed because it appears that the applicant may have been discriminated against on the basis of its status as a religious

institution. Id. at 350–51; Fortress Bible Church v. Feiner, 694 F.3d 208, 218–19 (2d Cir. 2012), see also Saints Constantine & Helen Greek Orthodox Church, Inc. v. City of New Berlin, 396 F.3d 895, 900 (7th Cir. 2005).

The Complaint properly alleges a substantial burden on Plaintiff's religious exercise. It alleges that, because of the permit denial, the GSIC members cannot construct a Mosque and adequately practice their religious beliefs. Complaint ¶¶ 27, 55. It also alleges that the denial of the permit was unlawful and discriminatory, and that the Defendant refuses to reconsider their dubious position. RLUIPA defines "religious exercise" to include the "use, building, or conversion of real property for the purpose of the religious exercise" for the people or entities that use or intend to use the property. 42 U.S.C. § 2000cc–5(7)(B). Further, "in the land use context, a plaintiff can succeed on a substantial burden claim by establishing that a government regulation puts substantial pressure on it to modify its behavior." Bethel World Outreach Ministries v. Montgomery Cty. Council, 706 F.3d 548, 556 (4th Cir. 2013). The denial of the septic permit despite qualifying for it constitutes a substantial burden. See U.S. v. Cty. of Culpeper, Va., 2017 WL 1169767 at *8.

While the Third Circuit has not explicitly ruled on these issues, many other circuits to have considered the question has held that, in the land use context, a plaintiff can succeed on a substantial burden claim by establishing that a government regulation puts substantial pressure on it to modify its behavior. See Westchester Day Sch., 504 F.3d at 349 ("[In the land use context,] courts appropriately speak of government action that directly *coerces* the religious institution to change its behavior. . . ." (emphasis in original)); Guru Nanak Sikh Soc'y of Yuba City v. Cnty. of Sutter, 456 F.3d 978, 988–89 (9th Cir. 2006) ("[A] substantial burden on religious exercise must impose a significantly great restriction or onus upon such

exercise." (internal quotation marks omitted)); Midrash Sephardi, Inc. v. Town of Surfside, 366 F.3d 1214, 1227 (11th Cir. 2004) ("[A] substantial burden is akin to significant pressure which directly coerces the religious adherent to conform his or her behavior accordingly." (internal quotation marks omitted)); Civil Liberties for Urban Believers v. City of Chicago, 342 F.3d 752, 761 (7th Cir. 2003) ("[A] land-use regulation that imposes a substantial burden on religious exercise is one that necessarily bears direct, primary, and fundamental responsibility for rendering religious exercise—including the use of real property for the purpose thereof within the regulated jurisdiction generally—effectively impracticable."); Bethel World Outreach Ministries v. Montgomery Cty. Council, 706 F.3d 548, 556 (4th Cir. 2013). Vineland seeks to modify the Mosque's behavior by purposefully misapplying waste requirements in order to prohibit the character and use of the Mosque. Indeed, if the Mosque gives up certain uses for the mosque, such as the warming kitchen, offices, and classrooms, then under the erroneous water flow calculations of the Vineland, it would receive its permit and certificate of occupancy. Vineland is simply seeking to curtail the nature and operation of the Mosque by imposing erroneous water flow calculations. If applied correctly and in a nondiscriminatory fashion, the Mosque would be able to maintain its kitchen, classroom, and offices, and still easily stay well below the two thousand gallon requirement.

Finally, RLUPIA defines religious exercise as "the use, building, or conversion of real property for the purpose of religious exercise shall be considered to be religious exercise of the person or entity that uses or intends to use the property for that purpose." 42 U.S.C. § 20000cc-5. This definition squarely applies to the instant matter as the use and building of the Mosque is inhibited, and therefore, so is the religious exercise of GSIC. It should be noted that RLUIPA's substantial burden provision says nothing about targeting.

Rather, it simply forbids government from imposing a substantial burden on religious exercise unless the Government demonstrates that it has used the least restrictive means of furthering a compelling governmental interest; that is, unless the governmental action satisfies strict scrutiny. 42 U.S.C. § 2000cc(a)(1). Bethel World Outreach Ministries v. Montgomery Cty. Council, 706 F.3d 548, 556–57 (4th Cir. 2013). What is more, when a religious organization buys property reasonably expecting to build a church, governmental action impeding the building of that church may impose a substantial burden. See Petra Presbyterian Church v. Vill. of Northbrook, 489 F.3d 846, 851 (7th Cir. 2007)( "[O]nce the organization has bought property reasonably expecting to obtain a permit, the denial of the permit may inflict a hardship on it."); see also Reaching Hearts Int'l, Inc. v. Prince George's Cnty., 584 F.Supp.2d 766, 786–87 (D.Md. 2008), aff'd by unpublished opinion, 368 Fed.Appx. 370 (4th Cir. 2010). Bethel World Outreach Ministries v. Montgomery Cty. Council, 706 F.3d 548, 557 (4th Cir. 2013). Finally, the astronomical expense associated with reconstructing the septic system to meet the erroneous calculations of Vineland make such a change prohibitively expensive. Separate and apart from whether the erroneous water flow calculations should be applied, the cost of complying with the erroneous water flow calculations functionally renders the Mosque unusable as the changes necessary to comply with the erroneous calculations are prohibitively expensive. The Complaint properly alleges claims for the imposition of a substantial burden. The Defendants' motion to dismiss must be denied.

D. The Complaint aptly states a claim for Discrimination under RLUIPA.

Independent of whether the waste permit is a zoning law, which it is, RUPIULA imposes liability when there is an improper application of a rule or regulation. RLUIPA's

unreasonable limitation provision provides that government shall not impose or **implement** a land use regulation that "unreasonably limits religious assemblies, institutions, or structures within a jurisdiction." 42 U.S.C. § 2000cc(b)(3)(B); Bethel World Outreach Ministries v. Montgomery Cty. Council, 706 F.3d 548, 560 (4th Cir. 2013). As is clear from the language of the statute, this includes disparate treatment in the implementation of zoning regulations. United States v. Bensalem Twp., Pennsylvania, 220 F. Supp. 3d 615, 622 (E.D. Pa. 2016). For example, a court in this circuit held that a RLUIPA nondiscrimination claim could be based on allegations that the plaintiff group faced a more rigorous approval process to obtain a conditional use variance. Adhi Parasakthi Charitable, Med., Educ., & Cultural Soc'y of N. Am. v. Twp. of W. Pikeland, 721 F.Supp.2d 361, 386 (E.D. Pa. 2010). When determining whether Defendants engaged in impermissible disparate treatment on the basis of religion, the Court must examine "the comparators' relation to the aims of the regulation." Lighthouse Inst., 510 F.3d at 264–65. Where a municipality enforces an ordinance against a plaintiff in a manner that does not conform to the stated goals of the ordinance, such that the enforcement is inconsistent as applied to the comparators, there is sufficient discriminatory intent under RLUIPA's Nondiscrimination Provision. Islamic Soc'y of Basking Ridge v. Twp. of Bernards, Civ. No. 16-1369, 2016 WL 7496661, at *24 (D.N.J. Dec. 31, 2016).

Here, the Complaint makes clear that there is a relevant comparator that was treated starkly different than the Plaintiff. A church in the same county with a bigger congregation, facility, seating capacity, and greater uses, was afforded a significantly less waste flow calculation. Moreover, the goals of the ordinance are to permit orderly and healthy waste management. The current system is more than adequate for the uses of the Mosque. Additionally, the statutes are clear that any waste flow under two thousand gallons are not

within the purview of the NJDEP. The Complaint alleges that the actual waste flow calculations are well below two thousand gallons. The Complaint also alleges that the current waste flow calculations are well within the waste permit originally issued. The waste generated by the Mosque is under one thousand-five hundred gallons, which is within the limit of the original septic permit. Thus, Vineland's application and implementation of waste flow calculations unreasonably limit the Mosque in violation of RUPIULA.

E. The Mosque has aptly stated a claim under the Equal Terms provision of RLUIPA.

In the Third Circuit, "[A] plaintiff asserting a claim under the RLUIPA Equal Terms provision must show (1) it is a religious assembly or institution, (2) subject to a land use regulation, which regulation (3) treats the religious assembly on less than equal terms with (4) a nonreligious assembly or institution (5) that causes no lesser harm to the interests the regulation seeks to advance." Lighthouse Inst., 510 F.3d at 270; United States v. Bensalem Twp., Pennsylvania, 220 F. Supp. 3d 615, 621 (E.D. Pa. 2016). Here, the first factor is undisputed. As to the second factor, as discussed above, the denial of the septic permit, and therefore the Certificate of Occupancy, is a land use regulation. The remaining factors are satisfied as Defendants treated the Mosque differently in purposefully misapplying the guidelines for waste. As discussed throughout, allotting waste for a warming kitchen in a religious institution is not permitted under the applicable guidelines, which is exactly what the Defendants did here. Applying the correct standard in a non-discriminatory fashion does not cause any harm to the interest that the regulation seeks to advance. In fact, the Defendants' application violates the rule and perverts the rule in purposefully misapplying it. In light of the foregoing, the Plaintiff has stated a claim under the Equal Terms provision of RLUIPA.

IV. GSIC states a claim under the Equal Protection Clause and under NJCRA.

It is axiomatic that under our Constitution, "all persons similarly situated should be treated alike." Second Baptist Church of Leechburg v. Gilpin Twp, Pennsylvania, 118 F. App'x 615, 618 (3d Cir. 2004). In order to establish an equal protection claim, the Plaintiffs must establish that they were treated differently from other similarly situated persons. See Congregation Kol Ami v. Abington Township, 309 F.3d 120, 137 (3d Cir. 2002); Church of Hills of Twp. of Bedminster v. Twp. of Bedminster, No. CIV. 05-3332, 2006 WL 462674, at *12 (D.N.J. Feb. 24, 2006).

Here, as more fully described above, Vineland is treating the Mosque differently in a variety of ways, including but not limited to, imposing additional waste flow calculations, imposing additional requirements for a warming kitchen that is not in accordance with the law, unlawfully imposing a tax, and refusing to issue a Certificate of Occupancy as required by the law. As such, the Mosque more than adequately alleges a claim under the Equal Protection provisions of the Constitution and NJCRA.

V. Plaintiff has alleged violation of its First Amendment Free Exercise Clause and under NJCRA.

Like the RLUIPA statute, to sustain the Plaintiff's Free Exercise claim under the First Amendment, a Plaintiff must demonstrate that the Township's actions impose a substantial burden on the Church's religious conduct. See Fraternal Order of Police Newark Lodge No. 12 v. City of Newark, 170 F.3d 359, 361 (3d Cir. 1999) (noting that the Free Exercise Clause of the First Amendment offers "religious exemptions from neutral, generally applicable laws that have the incidental effect of substantially burdening religious conduct."). For the reasons discussed herein, Defendant has imposed a substantial burden upon the Mosque. Indeed, the

Mosque cannot legally stay open without a permit and Certificate of Occupancy. Moreover, the unfair imposition of property tax also imposes a substantial burden on the Mosque. For the reasons stated herein, Plaintiff has established a claim for the violation of the Free Exercise Clause.

VI. The Mosque has properly alleged a claim for unlawful levy of taxes against it.

Vineland concedes that GSIC is a tax-exempt organization, has been since its inception years ago, has filed for tax exempt status before and after the tax was levied, and that, generally, GSIC should not be taxed. See Deft. Br. at 35; Compl. at ¶¶ 125-135. Yet stubbornly, it insists on imposing a tax against GSIC for the year 2015. According to Vineland's statutes, an improvement is "completed" when it is "[s]ubstantially ready for the intended use for which a building or structure is constructed, improved or converted." Vineland Code § 647-20; N.J.S.A. 54:4-63. Further, the Assessor shall determine, on October 1 of the year following the date of the completion of an improvement or construction, and the property shall continue to be treated in the appropriate manner for each of the five full tax years subsequent to the original determination by the Assessor." Vineland Code at § 647- 27; N.J.S.A. 54:4-63. The Defendants never provided any notice that it deemed that the Mosque was "completed," and therefore a tax exempt application was due. Rather, Vineland unilaterally decided that the building was substantially ready and therefore taxable without giving notice or opportunity to the Mosque to make yet another application for tax exempt status. Moreover, the building cannot be said to be substantially ready while the certificate of occupancy is being withheld. Defendants advance two mutually exclusive positions: on one hand claiming the building is substantially ready for use and therefore taxable, and also arguing that the septic system is unlawful and refusing to provide a final

certificate of occupancy. Tellingly, Defendants do not even argue that they provided notice that they considered the Mosque "completed," and therefore required yet another tax exempt application.

Additionally, as alleged, GSIC is the only religious institution that is required to file annual text exempt registration. Defendants impose this unique burden upon the Mosque because of its religious affiliation. Vineland concedes that before and after the tax was levied, it knew that GSIC was a tax-exempt religious organization. In light of the allegations, GSIC has stated a claim for the unlawful and discriminatory implementation of taxes against GSIC.

VII. Defendants violated GSIC's due process rights under the Constitution and under NJCRA.

The Fourteenth Amendment prohibits a state from "depriv[ing] any person of life, liberty, or property, without due process of law...." U.S. Const. amend. XIV, § 1. "A fundamental requirement of due process is the opportunity to be heard." Armstrong v. Manzo, 380 U.S. 545, 552 (1965) (internal quotation marks omitted). That opportunity "must be granted at a meaningful time and in a meaningful manner." Id. In the typical situation, the hearing should come before the Government deprives a person of his property. Elsmere Park Club, L.P. v Town of Elsmere, 542 F3d 412, 417 (3d Cir 2008). This makes practical sense, "[f]or when a person has an opportunity to speak up in his own defense, and when the State must listen to what he has to say, substantively unfair and simply mistaken deprivations of property interests can be prevented." Fuentes v. Shevin, 407 U.S. 67, 81 (1972).

Here, Vineland unilaterally revoked the permit provided to the Mosque, thereby making occupancy of the Mosque unlawful and subject to shut down at any pointy in time. It

provided no hearing or opportunity to be heard. It does not even argue that it did provide any pre or post deprivation hearing. Moreover, it revoked the permit without any pre-deprivation hearing or opportunity to be heard. As such, the Mosque was deprived of its property interest without due process of law. Lastly, contrary to the Defendants' assertion, GSIC is not required to obtain a determination from the NJPED because it does not fall within its purview save for the erroneous and discriminatory waste flow determinations of the Defendants.

VIII. <u>The Court has jurisdiction over Plaintiff's NJLAD claim.</u>

Defendants seek to strip this Court of jurisdiction over Plaintiff's NJLAD claims by selectively discussion Plaintiff's claims. While some of Plaintiff's NJLAD claims involve land use claims, others do not. For example, Plaintiff's claims for discrimination based upon religious beliefs and desperate treatment do not necessarily involve land use regulations. Indeed, Plaintiff asserts claims for unlawful discrimination pursuant to N.J.S.A. 10-5-3. As such, Plaintiff's NJLAD claims are not subject to dismissal. Furthermore, it would be inefficient for this Court to hear some of Plaintiff's claims, but not related claims. Judicial economy requires that all of Plaintiff's claims be hard before this Court.

IX. <u>Plaintiff respectfully requests permission to file an amended complaint should the Court deem any deficiency in the pleadings to exist</u>.

Plaintiff believes that its complaint aptly alleges its claims. Plaintiff's allegations, and the inferences drawn therefrom, are sufficient to defeat the Defendants' motion. Should the Court, however, deem there to be a deficiency in the pleadings, Plaintiff respectfully requests an opportunity to file an Amended Complaint rather than face dismissal.

Conclusion

For the foregoing reasons, Plaintiff respectfully requests that Defendants motion be denied in its entirety.

Dated: September 5, 2017

Respectfully submitted,

By: s/ Aymen Aboushi
Aymen A. Aboushi, Esq.

s/ Joel Silberman, Esq.
Joel Silberman, Esq.